UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| ALEXANDER RAIMO, individually and on behalf of all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON UNIVERSITY IN ST. LOUIS<br><br>Defendant. | Case No.: 4:20-CV-00634-SEP |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

In the face of an unprecedented public-health crisis caused by COVID-19, Washington University in St. Louis invested thousands of hours of faculty and staff time, and considerable other resources, to transition to a remote learning environment.  The point of this undertaking was to protect the health and safety of the University's students, faculty, and staff, while allowing the community to finish the Spring 2020 semester.  The University kept faith with its students, as it has since its founding in 1853, by ensuring that they could complete their semester without unduly risking their health and well-being.  And the University stands firmly behind the decisions it made in the face of the pandemic to protect its students' health and well-being and to continue its students' education under uniquely complex and challenging circumstances.

Alexander Raimo, an undergraduate student in the University's Olin Business School, contends that the University's discontinuation of in-person instruction and other services diminished the quality and value of his education, and so entitles him to a refund of tuition and fees and other damages.  All of Plaintiff's claims—for breach of contract, unjust enrichment, and conversion—are premised on the allegation that the University failed to provide its students the quality of education they were promised when the University transitioned to remote learning.

1

However, decades of Missouri law, as applied by this Court and the Eighth Circuit, definitively foreclose claims—whether brought in contract or tort—sounding in the quality or value of the education provided by a university. There is no way to avoid this principle, or the concerns that animate it, here: Plaintiff's claims all require this Court to assess what quality of education the University promised, what quality it delivered, and what dollar figure to assign any difference. Settled Missouri law provides that those are not questions this Court—or a jury—may answer. Even setting that prohibition aside, Plaintiff also separately fails to plead each of his claims individually. Consequently, the Complaint should be dismissed in its entirety.

## BACKGROUND

On March 11, 2020, as the novel coronavirus began to spread rapidly across the United States, the University announced that in-person classes would temporarily shift to online instruction as of March 23, after the University's spring break had concluded. (Compl. ¶¶ 43–44.) Undergraduate students were encouraged at that time to complete their Spring semester coursework at their permanent residences rather than on campus.[1] On March 31, 2020, as the public health crisis worsened, and following St. Louis City and St. Louis County's "Stay at Home" orders, the University issued an update, announcing its decision to continue remote learning for the remainder of the Spring semester, totaling 25 days of remote instruction. (*See id*. ¶ 45.) The University's announcement recognized that this challenging situation necessitated a change to *how* the University would complete its Spring semester, but also emphasized that the semester would in fact carry on.[2] Through the end of the Spring semester, University faculty taught classes

---

[1] *See* Letter from Andrew D. Martin (Mar. 11, 2020), *available at* https://emergency.wustl.edu/wp-content/uploads/2020/03/March-11-message-from-chancellor.pdf (cited at Compl. ¶ 44).

[2] *See* Letter from Marion G. Crain and Lori S. White (Mar. 31, 2020), *available at* https://emergency.wustl.edu/wp-content/uploads/2020/04/Students-Update-03-31-20.pdf (cited at Compl. ¶ 45).

remotely. The University adjusted fees for housing, dining, student parking fees, and a portion of the student health and wellness fee.[3] (*See id.* ¶ 46.)

On behalf of a putative class of students enrolled at the University for the Spring 2020 semester, Plaintiff seeks a refund of tuition, fees, and room and board which he alleges he paid for in-person educational services, facilities, access, and/or opportunities that the University allegedly did not provide when it shifted classes and other services online. (Compl. ¶ 62.) Specifically, Plaintiff claims that the University (1) breached an unidentified contract by failing to provide "in-person instruction in a physical classroom" (*id.* ¶¶ 75–81); (2) unjustly retained his Spring 2020 semester tuition and fees but failed to provide services for which tuition was collected (*id.* ¶¶ 82–88); and (3) engaged in unlawful conversion (*id.* ¶¶ 89–94).

## LEGAL STANDARD

To survive a motion to dismiss, a complaint "must allege sufficient facts that, taken as true, 'state a claim to relief that is plausible on its face.'" *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (citations omitted). A plaintiff's allegations are assumed to be true, but they cannot simply recite the elements of a cause of action and must be enough to raise a right to relief above a speculative level. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

*All* of Plaintiff's claims are subject to dismissal because well-settled Missouri law, including as applied by the Eighth Circuit, forecloses claims implicating the quality or value of education. And *each* of the claims is subject to dismissal on other, independent grounds because there are fatal defects in every one of the causes of action as pled.

---

[3] *See* Letter from Amy B. Kweskin and Robert M. Wild (Apr. 1, 2020), *available at* https://families.wustl.edu/important-updates-2/ (cited at Compl. ¶ 46).

I. **ALL OF PLAINTIFF'S CLAIMS ARE BARRED BY MISSOURI LAW FORECLOSING CLAIMS REGARDING THE QUALITY OR VALUE OF AN EDUCATION.**

Plaintiff's lawsuit asks this Court to conclude, as would be necessary for him to prevail on any of his claims, that the quality and value of his education was diminished by the University's temporary transition to online learning. Notably, Plaintiff does not allege that he paid tuition for credits he did not receive; rather, he variously seeks damages or restitution (*see* Compl. ¶¶ 81, 88, 94) for the purported difference in some undefined value between instruction provided in person and instruction provided online or through alternative formats. (*See id.* ¶ 2 ("[W]hile students enrolled and paid [the University] for a comprehensive academic experience, [the University] instead offers Plaintiff . . . something far less."); *id.* ¶ 10 (claiming that the transition to online learning has "decreased the quality of Plaintiff's education"); *see also id.* ¶¶ 79, 86–87, 91.) In other words, Plaintiff asks the Court to determine whether and how the quality of the education the University provided fell short of what Plaintiff alleges it was obligated to provide, and then to assign a financial value to the difference. Plaintiff's Complaint thus flies in the face of settled Missouri law foreclosing such disputes.

Under Missouri's "educational malpractice" doctrine, claims that ask the Court to "evaluate the course of instruction or the soundness of the method of teaching that has been adopted by an educational institution," and so would require "a comprehensive review of a myriad of educational and pedagogical factors, as well as administrative policies that enter into the consideration of whether the method of instruction and choice of [teaching aids] was appropriate, or preferable," are foreclosed. *Dallas Airmotive v. FlightSafety Int'l, Inc.*, 277 S.W.3d 696, 700 (Mo. Ct. App. 2008) (citation and internal quotation marks omitted) (alteration in original). Because analyzing these claims would require courts to act as "overseers of both the day-to-day

4

operation of [the] educational process as well as the formulation of its governing policies," courts have "held [such claims] to be non-cognizable." *Id.* This prohibition is based on:

> (1) the lack of a satisfactory standard of care by which to evaluate an educator; (2) the inherent uncertainties about causation and the nature of damages in light of such intervening factors as a student's attitude, motivation, temperament, past experience, and home environment; (3) the potential for a flood of litigation against schools; and (4) the possibility that such claims will embroil the courts into overseeing the day-to-day operations of schools.

*Id.* at 701 (citation and internal quotation marks omitted). In short, Missouri law does not recognize claims—including both contract and tort claims—that would require "micromanage[ment] of a university's daily operations." *Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 8 (Mo. Ct. App. 2013) (citation omitted).

This principle applies equally in federal court, as both this Court and the Eighth Circuit have consistently and recently confirmed. *E.g.*, *Roe v. St. Louis Univ.*, No. 4:08-CV-1474-HEA, 2012 WL 6757558, at *9–11 (E.D. Mo. Dec. 31, 2012), *aff'd*, 746 F.3d 874 (8th Cir. 2014). Only last year, for example, in *Soueidan v. St. Louis University*, 926 F.3d 1029 (8th Cir. 2019), the Eighth Circuit affirmed the dismissal of a complaint under this settled precedent, reasoning that courts applying Missouri law should not "'wade[] into the issue of how closely [a university] operated within the constructs of . . . aspirational [university handbook and catalog] provisions,'" as this would require "'analysis rife with . . . practical and policy concerns.'" *Id.* at 1036 (quoting *Gillis v. Principia Corp.*, 111 F. Supp. 3d 978, 985 (E.D. Mo. 2015), *aff'd*, 832 F.3d 865 (8th. Cir. 2016)); *see also id.* (noting that such analysis would reflect "complete disregard for Missouri law"). In that case, Soueidan had enrolled at St. Louis University to obtain a Ph.D. Even though the university's handbook indicated an advisor would be assigned within the first few weeks of classes, he was unable to find an advisor to supervise his studies for a year and a half. *Id.* at 1031–32. Soueidan alleged that there were an insufficient number of professors with funding or research

5

to serve as advisors, such that even when a professor agreed to serve as his advisor, the advisor did not have research or funding for Soueidan himself, and was uncertain about whether or when Soueidan could sit for the required qualifying examination. *Id.* at 1031, 1033. Ultimately, after over four years of study and nearly $200,000 in tuition payments, Soueidan was unable to obtain a Ph.D. and withdrew from the program. *Id.* at 1032–33. The Eighth Circuit noted that, in order to award relief on the plaintiff's claim for breach of contract, the court would need "to address not only the quality of the Ph.D. program but also whether Soueidan comprehensively and adequately completed all of his coursework" and "whether SLU timely assigned a Ph.D. advisor, conducted a student review, and scheduled the qualifying examination." *Id.* at 1036. Because this would constitute "intervention by the court [that] amount[s] to judicial supervision of [a university's] internal procedures,'" the Eighth Circuit held that judicial review was foreclosed and affirmed dismissal of Soueidan's complaint. *Id.* (quoting *Lucero*, 400 S.W.3d at 8); *see also Gillis v. Principia Corp.*, 832 F.3d 865, 872 (8th Cir. 2016).

Importantly here, Missouri law—as interpreted by federal courts—extends beyond disputes about curricular decisions to all facts of campus and university life, including fees assessed for non-curricular campus services. As this Court has explained, ascertaining which university services are "educational" is itself an exercise in academic decision making—and thus is a form of decision making that lies outside the purview of the Court—because it requires the Court to "inquire into the nuances of educational processes and theories." *Roe*, 2012 WL 6757558, at *10. Thus, in *Roe*, this Court dismissed claims alleging St. Louis University's physical training program was not "state of the art," and that the medical care that university provided was not from "top specialists," as allegedly promised. *Id.* at *10. Even though plaintiff's allegations in *Roe* were not directly related to coursework, this Court still found them barred. *Id.*; *see also McClean*

*v. Duke Univ.*, 376 F. Supp. 3d 585, 609 (M.D.N.C. 2019) (plaintiff's allegations that the university failed to provide her with counseling services it had advertised or promised were barred because counseling services were "integrally related to the educational process and to student wellbeing").

This Missouri doctrine is not an outlier,[4] as courts elsewhere in the country have applied the principles enshrined in *Soueidan* and other Missouri cases to forbear from deciding all sorts of disputes between students and their schools, including where schools are constrained to cancel classes as a result of national crises. In *Paynter v. New York University*, 319 N.Y.S.2d 893 (N.Y. App. Div. 1971), for example, a student's father sought a tuition refund after New York University cancelled all classes for the remainder of the school year in the wake of Kent State. The appellate court reversed a judgment in favor of the father, holding that "the court erred in substituting its judgment for that of the University administrators and in concluding that the University was unjustified in suspending classes for the time remaining in the school year prior to the examination period." *Id.* at 894. The court went on to note that "while in a strict sense, a student contracts with a college or university for a number of courses to be given during the academic year, the services rendered by the university cannot be measured by the time spent in a classroom." *Id.*

This unbroken line of precedent, in Missouri and elsewhere, compels dismissal here. As in *Soueidan*, Raimo complains that the University failed to live up to promises about the quality of the education it would provide. Answering the legal questions his complaint posits would embroil this Court in precisely the inquiries that *Soueidan* confirms are impermissible under

---

[4] *See, e.g.*, *Andre v. Pace Univ.*, 655 N.Y.S.2d 777, 779 (N.Y. App. Div. 1996) ("To entertain a cause of action for 'educational malpractice' would require the courts not merely to make judgments as to the validity of broad educational policies—a course we have unfalteringly eschewed in the past—but, more importantly, to sit in review of the day-to-day implementation of these policies." (quoting *Donohue v. Copiague Union Free Sch. Dist.*, 391 N.E.2d 1352, 1354 (N.Y. 1979))); *Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 251 (6th Cir. 2005) (stating that claims are barred if they "challenge the adequacy of the education that Vanderbilt provided").

Missouri law. 926 F.3d at 1036. *Paynter* further underscores the point. There, NYU cancelled classes outright, whereas here the University made a more modest accommodation and continued to teach and carry on student life remotely for the 25 days of instruction remaining in the undergraduate academic calendar. The University's decision was well in line with the rule *Paynter* powerfully illustrates: The quality of the education provided by a university cannot be evaluated mechanically, and courts should refrain from searching and intrusive interference in disputes over universities' responses to unforeseen and dangerous extrinsic events. And as the Missouri case law cited above demonstrates, this doctrine equally forecloses Raimo's claims with respect to fees: To the extent his claims attempt to encompass "the campus experience" (*see* Compl. ¶ 20), or something beyond remote coursework, such claims are still subject to the law preventing courts from interfering in disputes over the quality of a student's education and must be dismissed. *E.g.*, *Roe*, 2012 WL 6757558, at *10.

The logic of Missouri's educational malpractice doctrine proves itself here. To render judgment in this case, the factfinder would need to wade into exactly the kinds of disputes from which this Court and others have steered clear in order to determine whether the University's Spring 2020 classes were "something far less" than the "comprehensive academic experience" Plaintiff says he was promised, such that Plaintiff is entitled to damages. (Compl. ¶ 2.) What would the factfinder's deliberations look like for the claims of a hypothetical English major: Is an online discussion section in her World Literature class truly of lower quality than the discussion sections held in person before the pandemic? Can the same be said for large lecture classes that involve less face-to-face interaction? If her classes are indeed of lower quality when conducted virtually, has she been deprived of $1,000 in the value of her education, or is it $2,000? What standards could the factfinder use to make that determination? Does it matter if the student

continues to remotely use library services, or if she never used the library in the first place? If she got her course credits for the class, how does one offset the value of those credits—notwithstanding the supposed diminution in the subjective value of the coursework—in determining her alleged damages? And does this vary between the hypothetical English major, who does not need access to lab space, and her biology major roommate, who does use such access?

To answer any of these questions—which are all necessary predicates to a judgment in Plaintiff's favor—the factfinder would have to make the very kinds of determinations that courts have previously said put claims like Plaintiff's outside the scope of judicial review.[5] Among other things, the task of asking and answering these questions "lack[s] . . . a satisfactory standard of care by which to evaluate an educator," implicates "the inherent uncertainties about causation and the nature of damages," threatens "a flood of litigation against schools," and promises to "embroil the courts into overseeing the day-to-day operations of schools." *Dallas Airmotive*, 277 S.W.3d at 701.[6] Under settled Eighth Circuit and Missouri law, the mandated course is not to interfere and, instead, to dismiss the case.

---

[5] Plaintiff would not avoid these problems by seeking reimbursement on a prorated basis. Prorating tuition requires determining by what percentage it should be prorated. Unless the Court were to find that the value of the University's online and alternative courses is zero—not an allegation Plaintiff himself makes, nor one supported by the Complaint—choosing the proration percentage still requires the Court to answer the questions above that are not susceptible to judicial review. *E.g.*, *Soueidan*, 926 F.3d at 1034 (citations omitted) ("A claim that educational services provided were inadequate, substandard, or ineffective constitutes a claim of educational malpractice").

[6] The threat of proliferate litigation is palpable. If the Court entertained claims like Plaintiff's, what would prevent a student from suing for a partial tuition refund if his tenured professor fell ill partway through a semester and his class was taught by an adjunct instructor instead? And what would stop a lawsuit from a student who believes her university's decision to change a graded course to pass/fail diminishes the value of her educational experience? One might even see demands for tuition reduction from students complaining that their professor was not as engaging as the professor who taught a different section. This is a slippery slope on which this Court consistently has chosen not to embark.

## II.   PLAINTIFF'S THREE CAUSES OF ACTION ARE INADEQUATELY PLED.

None of Plaintiff's claims can proceed because Missouri law bars this type of educational dispute between student and university.  Even if the Court were to consider whether the claims are adequately pled, however, they still fail for independent reasons.

### A.   Plaintiff Has Failed To Allege Any Breach Of Contract.

Plaintiff fails to do the bare minimum necessary to plead a claim for breach of contract—namely, identify a valid contract that the University breached.  As a general rule, "in order to assert a breach of contract claim against a university, a student plaintiff must 'point to an identifiable contractual promise that the [university] failed to honor.'"  *Nickel v. Stephens Coll.*, 480 S.W.3d 390, 397 (Mo. Ct. App. 2015) (quoting *Lucero*, 400 S.W.2d at 5) (alteration in original).  But "[w]hile other jurisdictions have found a contractual relationship exists between a student and a university," there is no "case law in Missouri that expressly finds the existence of a contractual relationship between a student and a university."  *Lucero*, 400 S.W.3d at 4–5 (citation omitted).  Nor is there a "case in Missouri that has held that an *implied* contract for educational services arises between a student and [u]niversity."  *Nickel*, 480 S.W.3d at 397.  In order to plead a contract claim under Missouri law, then, Plaintiff must establish an "objective or quantifiable promise[]" to demonstrate that a contract exists *at all*.  *Lucero*, 400 S.W.3d at 7.

As the basis for his contract claim, Plaintiff cites an array of promotional language from the University's website.  In addition to factual statements about the location of the University's campus (which, of course, remain true even during the pandemic) (*see, e.g.*, Compl. ¶¶ 22, 24 (noting that the University's campus is "located near the cultural center of St. Louis" and that it has "40 acres of undergraduate residential life space")), the Complaint cites as the basis for the alleged contract an array of statements regarding the experiences students may have during their time at the University—for instance, that at the University a student "can be an individual and

10

achieve exceptional things," that "the knowledge and resources of this city are yours for the taking," that the student-faculty ratio provides for "more hands-on opportunities to develop real-world skills," and that residential students will "get to know others and become involved in numerous activities and organizations." (*Id.* ¶¶ 22–23, 25; *see generally id.* ¶¶ 22–28.)

This language, however, is purely "aspirational in nature" and "amount[s] to general statements that [the University], as a university, seeks to achieve in maintaining a positive work and learning environment"—and consequently, this language "cannot constitute the basis for a breach of contract claim." *Lucero*, 400 S.W.3d at 6; *see also Gillis*, 832 F.3d at 873 (affirming dismissal of contract claim premised on "aspirational" statements rather than on "objective or quantifiable promises"). Treating the language Plaintiff cites as the "identifiable contractual promise" required for a breach of contract claim under Missouri law only underscores the absurdity of his position. A student who fails to "achieve exceptional things," does not receive "hands-on opportunities to develop real-world skills," or does not "get to know others and become involved in numerous activities and organizations" (Compl. ¶¶ 22–23, 25) self-evidently would have no claim for breach of contract. Nor can Plaintiff use "general policy statements expressing [the University's] aspiration to provide a positive work and learning environment," *Lucero*, 400 S.W.3d at 7, that are individually unenforceable to piece together some unspoken, unwritten promise to provide in-person learning—let alone a promise that directly links in-person learning to the value of tuition or fees. Rather, Plaintiff must identify "objective or quantifiable promises made by [the University]." *Id.* His failure to do so means that his breach of contract claim fails.

### B.   Plaintiff Cannot State a Claim for Unjust Enrichment Or Conversion.

Plaintiff's other two claims—for unjust enrichment and conversion—also must fail.

First, Plaintiff has failed to adequately allege that the University was unjustly enriched. To prevail on an unjust enrichment theory under Missouri law, a plaintiff must plausibly allege

11

"'(1) that the defendant was enriched by the receipt of the benefit; (2) that the enrichment was at the expense of the plaintiff; [and] (3) that it would be unjust to allow the defendant to retain the benefit.'" *S & J, Inc. v. McLoud & Co.*, 108 S.W.3d 765, 768 (Mo. Ct. App. 2003) (quoting *Petrie v. Levan*, 799 S.W.2d 632, 635 (Mo. Ct. App. 1990)). "The most significant of the elements for a claim of unjust enrichment is the last element, which is the requirement that the enrichment of the defendant be unjust." *Id.* (citing *Assoc. Eng'g Co. v. Webbe*, 795 S.W.2d 606, 608 (Mo. Ct. App. 1990)). "There must be some something more than passive acquiescence, such as fault or undue advantage on the part of the defendant, for defendant's retention of the benefit to be unjust." *Id.*

But this is precisely where Plaintiff's claim falls short. The Complaint includes threadbare recitals of the elements of an unjust enrichment claim (Compl. ¶¶ 82–88), but provides no supporting allegations that the University *inequitably* retained the cost of tuition or other fees paid by Plaintiff. In fact, Plaintiff has nowhere alleged (nor can he) that his tuition and fees have been used for any purpose other than for the reason the funds were collected—*i.e.*, to further the educational goals of the University. And Plaintiff does not allege, as he must, that he receives no benefit from the University's expenditures. On the contrary, Plaintiff acknowledges that the University has gone to great lengths to transition its curriculum to an online and alternative learning environment amidst the pandemic. (*See id*. ¶¶ 43–45.) Where—as here—a plaintiff still reaps the benefit of the University's expenditures, an unjust enrichment claim must be dismissed. *See Anderson v. Bass Pro Outdoor World, LLC*, 355 F. Supp. 3d 830, 839 (W.D. Mo. 2018) (where plaintiffs claimed they were lured into a store by a particular deal the store was unable to honor, and yet plaintiffs made other transactions while in the store, they could not pursue unjust enrichment claim because they still received a benefit even if it was not "the 'benefit' they intended to receive"); *cf. Moss v. Wayne State Univ*., Case No. 286034, 2009 WL 4344193, at *2 (Mich. Ct.

App. Dec. 1, 2009) (where university charged a "contingency fee" to protect against state budget shortfalls that did not actually materialize, rejecting plaintiff's argument that university was unjustly enriched by failing to refund that fee where students "gained a general benefit from the university's expenditures, which included spending in areas that would directly benefit students").

The conversion claim also fails.  Under Missouri law, "as a general rule a claim for money may not be in conversion because conversion lies only for a specific chattel which has been wrongfully converted."  *Gaffney v. Cmty. Fed. Sav. & Loan Ass'n*, 706 S.W.2d 530, 533 (Mo. Ct. App. 1986).  Courts have explained that "[m]oney is the appropriate subject of conversion only when it can be described or identified as a specific chattel."  *Dayton Constr., Inc. v. Meinhardt*, 882 S.W.2d 206, 208 (Mo. Ct. App. 1994).  Courts thus allow conversion claims for money where the money in question is in a specified account, is not commingled with other funds, and/or is entrusted to a defendant for a specific purpose.  *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 415–16 (Mo. Ct. App. 2000); *Boswell v. Panera Bread Co.*, 91 F. Supp. 3d 1141, 1145 (E.D. Mo. 2015) (collecting cases).  Conversion of money thus arises only in exceedingly narrow circumstances, and asserting the claim requires Plaintiff to plead the existence of identifiable, segregated funds and the amount that the University allegedly converted from its intended purpose.  Plaintiff's barebones conversion allegations fall well short of that standard.  Indeed, given that the money students pay to a university is fungible, Plaintiff could never state a conversion claim with respect to tuition or fees.  *See Stegall v. Peoples Bank of Cuba*, 270 S.W.3d 500, 504 (Mo. Ct. App. 2008) (stating that "conversion was not the appropriate legal theory to use when seeking to recover improperly distributed cash" because "money [is] a completely fungible item").[7]

---

[7] Nor would it help Plaintiff to suggest that he may pursue a conversion claim for fees that are paid for particular services when those services are allegedly not provided.  *Cf. Hall v. W.L. Brady Investments, Inc.*, 684 S.W.2d 379, 384 (Mo. Ct. App. 1984) (holding that it was error to submit

Moreover, for the reasons discussed above with respect to the unjust-enrichment claim, Plaintiff cannot plausibly allege conversion where he acknowledges that the University has transitioned to online learning, enabling students to continue to avail themselves of University resources and services.  (*See* Compl. ¶¶ 43–45.)  To state a claim for conversion, plaintiff must allege that the University diverted his funds "to another, different purpose," *Gadberry v. Bird*, 191 S.W.3d 673, 675–76 (Mo. Ct. App. 2006), "in denial of his right or inconsistent with it," *In re Estate of Boatright*, 88 S.W.3d 500, 506 (Mo. Ct. App. 2002) (quoting *Reason v. Payne*, 793 S.W.2d 471, 474 (Mo. Ct. App. 1990)); *see also Rehbein v. St. Louis Sw. Ry. Co.*, 740 S.W.2d 181, 183 (Mo. Ct. App. 1987) ("[P]laintiff must have delivered funds to a defendant for a specific purpose, and the defendant must have diverted them to a different purpose of his own.").  Plaintiff makes no such allegation here—indeed, given the University's successful effort to continue students' education in the face of the pandemic, he can hardly allege that the money he paid was used for anything other than its intended purposes or in derogation of his rights.

One final point bears emphasis.  Each of Plaintiff's three claims are grounded in allegations that the University failed to satisfy a promise to provide in-person instruction and services as a result of the payment of tuition—whether such promise was alleged to be explicit (*see* Compl. ¶ 77 (contract claim stating that "Plaintiff and Class Members paid Defendant tuition . . . for Defendant to provide in-person instruction")) or was somehow implicit in the terms of the parties' relationship (*see id.* ¶ 83 (unjust enrichment claim based on allegation that Plaintiff paid tuition "so that [he] and the Class Members could avail themselves of in-person educational opportunities"); *id.* ¶ 90

---

conversion claim to jury where "respondents' claim was in damages for loss of the amount of the fee, not because [the defendant] converted money entrusted to it for a particular purpose, but because [the defendant] breached the commitment agreement by refusing to close the loan after respondents had performed, as they contended, all applicable loan conditions").

14

(conversion claim based on allegation that "Plaintiff and the other members of the Class have an undisputed right to receive educational services" and "obtained such rights by paying Defendant tuition")). As already discussed, Missouri law is clear that any contract claim by a student against a university must be based on a clear, objective, and quantifiable promise—and it is equally clear that the aspirational language Plaintiff cites as the basis for his claim is not enough to create a valid contract. (*See supra* Section II.A.) Plaintiff's efforts to ground his unjust enrichment and conversion claims on exactly the same allegations—payment of tuition for an expected service— constitute an impermissible end-run around this rule, using alternative claims to attempt to extract enforceable obligations where Missouri law is emphatic that no contractual promise exists. Allowing these derivative claims to proceed would eviscerate the standard Missouri courts have laid out for student-university contracts by permitting a student to enforce through unjust enrichment law alleged obligations that Missouri law deems unenforceable. Because Counts II and III rely on the same conduct as the failed Count I, "[t]he derivative claims of conversion and unjust enrichment necessarily fail as well." *Farm Credit Servs. of Am. v. Am. State Bank*, 339 F.3d 764, 772 (8th Cir. 2003) (applying Iowa law, where conversion and unjust enrichment claims were derivative of a failed count of wrongful claim of late return); *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1121 (8th Cir. 2012) (applying Minnesota law, affirming "dismiss[al of] tort and declaratory judgment claims as derivative of the [also dismissed] contract claims").

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed.

15

Dated: July 27, 2020

Respectfully submitted,

*/s/  Winthrop B. Reed III*
Winthrop B. Reed III, #42840MO
R. Taylor Matthews, III, #60936MO
Sarah A. Milunski, #65112MO
LEWIS RICE LLC
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
Tel.: (314) 444-7600
Fax: (314) 241-6056
Email: wreed@lewisrice.com
          tmatthews@lewisrice.com
          smilunski@lewisrice.com

Alan E. Schoenfeld (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 937-7294
Fax:  (212) 230-8888
Email: alan.schoenfeld@wilmerhale.com

*Attorneys for Defendant Washington University in St. Louis*