UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ALEXANDER RAIMO, *individually and on behalf of all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> WASHINGTON UNIVERSITY IN ST. LOUIS, <br><br> Defendant. | Case No. 4:20-cv-00634-SEP |

## **MEMORANDUM AND ORDER**

Before the Court is Defendant Washington University in St. Louis's Motion to Dismiss the Amended Complaint.  Doc. 25.  The Motion is fully briefed and ready for disposition.  For the reasons set forth below, the Motion is granted.

### FACTS AND BACKGROUND

Plaintiff Alexander Raimo is an undergraduate student at Defendant Washington University in St. Louis.[1]  In response to the spread of COVID-19, on March 11, 2020, the University temporarily canceled in-person classes and transitioned to remote learning.  While expected to be only temporary at first, the University announced on March 31, 2020, that the remainder of the semester would be conducted online.  Doc. 23 ¶ 56.  Students were instructed to complete their coursework at their permanent residences and were required to leave the University's residence halls and apartments.  *Id.* ¶¶ 55, 62.  The University noted that it was "working hard to finalize and process refunds related to residential life housing, dining, parking, and a partial refund of the student health fee."  *Id.*

Raimo was registered for classes for the Spring 2020 semester.  His Spring 2020 semester expenses consisted of:  (1) $27,125.00 for tuition; (2) $6,474.00 for housing; (3) a maximum of $3,319.50 for a meal plan; (4) $250.00 for a student health and wellness fee; and

---

[1] For the purpose of this Motion, the Court assumes that the factual allegations in the Amended Complaint are true.  *Neitzke v. Williams,* 490 U.S. 319, 326-27 (1989).

(5) $271.00 for an undergraduate activities fee. Doc. 23 ¶ 38. The University agreed to prorate housing, student parking fees, and a portion of the student health and wellness fee. *Id.* ¶ 72. The University also issued refunds on a student-by-student basis for meal plan balances and lost wages for students in work study programs. *Id.*

The Complaint thus focuses on tuition for full-time students, which the University classifies as any student who takes between 12 and 18 credit hours. Because the University charged a flat tuition rate for all full-time students, the dollar-to-credit ratio varied between $1,506 and $2,260 per credit, depending on how many hours the student was enrolled in. Raimo claims that, either way, the amount was "significantly higher" than the cost of the University's online-only programs. *Id.* ¶¶ 39-41. He argues that his tuition paid for the benefits, services, opportunities, and facilities that come along with "on-campus courses." *Id.* ¶ 43. When the University was forced to close its facilities due to the COVID-19 pandemic in March 2020, it did not refund any tuition, explaining that students would still be able to complete coursework and receive full credit toward their degree programs. *Id.* ¶¶ 73-74.

Raimo brings this action seeking monetary relief under the Class Action Fairness Act on behalf of himself and a purported class of Washington University students. Raimo claims that moving classes online deprived him and the purported class of:

> in-person learning from their peers and school faculty . . . . , access to the facilities, materials, and opportunities only offered on [the University's] physical campus, including laboratory and research experience, use of campus facilities, such as the gym and libraries, and use of on-campus services and events such as sporting events, end-of-year programs, lectures, and various student services.

*Id.* ¶ 62. The Amended Complaint brings four counts:

**Count I**:     Breach of Contract
**Count II**:    Breach of Implied Contract
**Count III**:   Unjust Enrichment
**Count IV**:    Conversion

*See* Doc. 23 at 23, 24, 26, 28. For the reasons set forth below, all four counts are dismissed.

## LEGAL STANDARD

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is to test the legal sufficiency of the complaint. When considering a Rule 12(b)(6) motion, the court assumes all of the complaint's factual allegations to be true and construes all reasonable

inferences in favor of the nonmoving party.  *See Neitzke,* 490 U.S. at 326-27; *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (citation omitted).  Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a motion to dismiss, the complaint must allege facts supporting each element of the plaintiff's claims and must rest on more than mere speculation.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Specifically, the complaint "must allege more than '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements'" and instead must "allege sufficient facts that, taken as true, 'state a claim to relief that is plausible on its face.'"  *K.T. v. Culver-Stockton Coll.,* 865 F.3d 1054, 1057 (8th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court "need not accept as true plaintiff's conclusory allegations or legal conclusions drawn from the facts."  *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).  The issue in considering such a motion is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of the claim.  *See Twombly,* 550 U.S. at 556.

DISCUSSION

The University argues that all of Raimo's claims are barred by Missouri's educational malpractice doctrine.  The University also argues that each count is independently deficient for failure to state a claim.  The Court addresses each argument in turn.

**I.**    **Educational Malpractice Doctrine**

It is not a court's role to "micromanage a university's daily operations."  *Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 8 (Mo. App. 2013) (citing *Dallas Airmotive, Inc. v. FlightSafety Int'l, Inc.*, 277 S.W.3d 696, 700 (Mo. App. 2008) (Courts "have refused to become the overseers of both the day-to-day operation of the educational process as well as the formulation of its governing policies.")).  "Generally, courts have refrained from recognizing educational malpractice claims, either in tort or contract, on the premise that '[u]niversities must be allowed the flexibility to manage themselves and correct their own mistakes.'"  *Id.* (quoting *Miller v. Loyola Univ. of New Orleans*, 829 So. 2d 1057, 1061 (La. Ct. App. 2002)).  The Eighth Circuit recently summarized Missouri's educational malpractice doctrine:

> In educational malpractice cases, a plaintiff sues his or her academic institution for tortiously failing to provide adequate educational services.  If a

3

negligence claim raises questions concerning the reasonableness of the educator's conduct in providing educational services, then the claim is one of educational malpractice. Similarly, if the claim requires an analysis of the quality of education received and in making that analysis the fact-finder must consider principles of duty, standards of care, and the reasonableness of the defendant's conduct, then the claim is one of educational malpractice. If the duty alleged to have been breached is the duty to educate effectively, the claim is one of educational malpractice. A claim that educational services provided were inadequate, substandard, or ineffective constitutes a claim of educational malpractice. Where the court is asked to evaluate the course of instruction or the soundness of the method of teaching that has been adopted by an educational institution, the claim is one of educational malpractice.

*Soueidan v. St. Louis Univ.*, 926 F.3d 1029, 1034-35 (8th Cir. 2019) (quoting *Dallas Airmotive*, 277 S.W.3d at 700).

Although *Soueidan* expressly mentioned tort claims, Missouri's educational malpractice doctrine bars certain contract claims as well. *See Lucero*, 400 S.W.3d at 8 ("whether identified as one for breach of contract as [plaintiff] argues, or perhaps more accurately as one sounding in tort, [plaintiff's claim] 'raises questions concerning the reasonableness of the educator's conduct in providing educational services' and, as such, 'is one of educational malpractice,' which Missouri courts have recognized as a non-cognizable claim"). But it does not foreclose all causes of action between students and universities. *See, e.g., Blake v. Career Educ. Corp.*, 2009 WL 2567011, at *2 (E.D. Mo. Aug. 18, 2009) (noting that "courts have recognized claims by students for breach of contract, fraud, or other intentional wrongdoing that allege a private or public educational institution has failed to provide *specifically promised educational services*") (quoting *Alsides v. Brown Institute Ltd.*, 592 N.W.2d 468, 472 (Ct. App. Minn. 1999) (emphasis in original)). Although it is possible for a contract claim to elude the educational malpractice doctrine, the student must allege the existence of "specific promises [the university] made to the student and the claim [must] not involve an inquiry into the nuances of educational processes and theories." *Id.* (quoting *Alsides*, 592 N.W.2d at 473).

In states that recognize the educational malpractice doctrine, courts have generally cited four public policy grounds for doing so:

(1) the lack of a satisfactory standard of care by which to evaluate an educator; (2) the inherent uncertainties about causation and the nature of damages in light of such intervening factors as a student's attitude, motivation, temperament, past experience, and home environment; (3) the potential for a

flood of litigation against schools; and (4) the possibility that such claims will "embroil the courts into overseeing the day-to-day operations of schools."

*Dallas Airmotive*, 277 S.W.3d at 701 (quoting *Page v. Klein Tools, Inc.*, 601 N.W.2d 900, 903 (Mich. 2000).

Here, because none of Raimo's claims involves a standard of care, the first policy rationale for the educational malpractice doctrine is not implicated. The other three certainly are. A breach of contract claim requires a showing of damages, *see Keveney v. Mo. Military Academy*, 304 S.W.3d 98, 104 (Mo. banc 2010), with all of the "inherent uncertainties" noted by the Missouri Court of Appeals. The potential for a flood of litigation is substantial, as indicated by the wave of similar cases filed in courts across the country. *See, infra,* n. 3. And given the complexity of the challenge of delivering comprehensive higher education during a worldwide pandemic, there is a substantial possibility that entertaining such claims will embroil the courts in a task for which they are ill-suited: second-guessing the day-to-day operational decisions of universities.

Nevertheless, other courts faced with the same question in similar cases have largely concluded that the educational malpractice doctrine does not bar these claims. For example, a court in this district recently ruled against a defendant-university that raised similar arguments on a motion to dismiss. *See Martin v. Lindenwood Univ.*, 2021 WL 3077665, at *8 (E.D. Mo. July 21, 2021). In *Lindenwood*, the student-plaintiff alleged that Lindenwood University charged more for "full-time undergraduate in-person tuition" than for "online tuition." *Id.* at *2. The court held that, despite Missouri's educational malpractice doctrine, the student's claims for breach of contract and unjust enrichment could survive a motion to dismiss,[2] because the court found that the student's primary allegation was that "he was promised an in-person college experience . . . but was afforded an online experience that Lindenwood itself valued less." *Id.* at *4. Such a claim, the court held, "does not necessarily require" a court to "examine Lindenwood's pedagogical practices and instruction," and "at this early stage . . . Martin's allegations that he received an entirely different educational experience are sufficient." *Id.*

---

[2] The court dismissed the claim for conversion, finding that "[c]onversion is not the appropriate action when the claim is solely for the recovery of money." *Id.* at *7 (quoting *Boswell v. Panera Bread Co.*, 91 F. Supp. 3d 1141, 1145 (E.D. Mo. 2015)).

Numerous other courts have been confronted with similar COVID-19 tuition reimbursement claims.[3]  Of those courts that have reached the educational malpractice issue,

---

[3] *See Shak v. Adelphi Univ.*, 549 F. Supp. 3d 267, 271-74 (E.D.N.Y. July 15, 2021) (rejected applicability of educational malpractice doctrine; dismissed tuition-based breach of contract claim, unjust enrichment claim, and conversion claim; declined to dismiss fee-based breach of contract claim);

*Flatscher v. Manhattan Sch. of Music*, 2021 WL 3077500, at *7, 9, 10, n.13 (S.D.N.Y July 20, 2021) (rejected applicability of educational malpractice doctrine; dismissed conversion claim; declined to dismiss claims for breach of contract and unjust enrichment);

*Amable v. New Sch.*, 2021 WL 3173739, at *4, 5, 13 (S.D.N.Y. July 27, 2021) (rejected applicability of educational malpractice doctrine; dismissed breach of contract and unjust enrichment claims);

*Warner v. Wartburg College*, 2021 WL 3276375, at *4-5, 10 (N.D. Iowa July 30, 2021) (rejected applicability of the educational malpractice doctrine; dismissed unjust enrichment claim; declined to dismiss breach of contract claim);

*Wnorowski v. Univ. of New Haven*, WL 2021 3374737, at *4, 6, 7 (D. Conn. Aug. 3, 2021) (rejected applicability of educational malpractice doctrine; declined to dismiss breach of contract and unjust enrichment claims);

*Pinzon v. Pepperdine Univ.*, 2021 WL 3560782, at *5-7 (C.D. Cal. Aug. 5, 2021) (rejected applicability of educational malpractice doctrine; dismissed breach of contract, implied contract, unjust enrichment, and conversion claims brought by parent of student);

*In re Univ. of So. Cal. Tuition and Fees COVID-19 Refund Litig.*, 2021 WL 3560783, at *3, 7-9 (C.D. Cal. Aug. 6, 2021) (rejected applicability of educational malpractice doctrine; declined to dismiss breach of contract claim; dismissed unjust enrichment and conversion claims);

*Fedele v. Marist College*, 2021 WL 3540432, at *7-9 (S.D.N.Y. Aug. 10, 2021) (rejected applicability of educational malpractice doctrine; dismissed breach of contract, unjust enrichment, and conversion claims);

*Figueroa v. Point Park Univ.*, 2021 WL 3549327, at *1 (W.D. Pa. Aug. 11, 2021) (rejected applicability of educational malpractice doctrine; declined to dismiss breach of contract and unjust enrichment claims; dismissed conversion claim);

*Brittain v. Trustees of Columbia Univ. in the City of New York*, 2021 WL 3539664, at *3-4, 9 (S.D.N.Y. Aug. 11, 2021) (rejected applicability of educational malpractice doctrine; dismissed unjust enrichment claim; declined to dismiss breach of contract claim);

*Dean v. Chamberlain Univ., LLC*, 2021 WL 3617471, at *1 (N.D. Ohio Aug. 16, 2021) (dismissed breach of contract and unjust enrichment claims);

*Ninivaggi v. Univ. of Del.*, 2021 WL 3709765, at *1 (D. Del. Aug. 20, 2021) (declined to dismiss breach of implied contract and unjust enrichment claims; dismissed conversion claim);

*Polley v. Northwestern Univ.*, 2021 WL4192076, at *7-9 (N.D. Ill. Sept. 15, 2021) (rejected applicability of educational malpractice doctrine; dismissed breach of contract, implied contract, and unjust enrichment claims);

at least four have held that the educational malpractice doctrine barred a student's claim. *See Lindner v. Occidental College*, 2020 WL 7350212, at *6 (C.D. Cal. Dec. 11, 2020); *Gociman v. Loyola Univ. of Chicago*, 515 F. Supp. 3d 861, 867 (N.D. Ill. 2021); *Jones v. Administrators of Tulane Educ. Fund*, 2021 WL 5097769, at *4 (E.D. La. Sept. 29, 2021); *De Leon v. New York Univ.*, 2022 WL 179812, at *13 (S.D.N.Y Jan. 20, 2022).

Despite the majority of courts having held that similar claims were not barred by the educational malpractice doctrine, the University urges this Court to hold that all of Raimo's claims are barred by Missouri's educational malpractice doctrine. Doc. 26 at 4. The University argues that the Complaint boils down to one main claim: "the purported difference in some undefined value between instruction provided in person and instruction provided online." *Id.* This, the University contends, would require the Court to "determine whether and how the quality of education the University provided fell short of what Plaintiff alleges it was obligated to provide, and then to assign a financial value to the difference." *Id.* The University points to *Soueidan*, which provides that, "[a] claim that educational services provided were *inadequate*,

---

*Mooers v. Middlebury College*, 2021 WL 4225659, at *5, 7, 9-10 (D. Vt. Sept. 16, 2021) (rejected applicability of educational malpractice doctrine; dismissed breach of contract and conversion claims; declined to dismiss unjust enrichment claim);

*Delisle v. McKendree Univ.*, 2021 WL 4402474, at *1-3 (S.D. Ill. Sept. 27, 2021) (rejected application of educational malpractice doctrine; dismissed breach of contract and unjust enrichment claims);

*Jones v. Administrators of Tulane Educ. Fund*, 2021 WL 5097769, at *4 (E.D. La. Sept. 29, 2021) (finding that the plaintiff's breach of contract claim "essentially morph[ed] into an educational malpractice claim," and dismissed the breach of contract, unjust enrichment, and conversion claims);

*Fiore v. Univ. of Tampa*, 2021 WL 4925562, at *17-20 (S.D.N.Y. Oct. 20, 2021) (dismissed fee-based breach of contract, unjust enrichment, and conversion claims; declined to dismiss tuition-based breach of contract and unjust enrichment claims);

*Hutchinson v. Univ. of St. Joseph*, 2022 WL 19339, at *4-6 (D. Conn. Jan. 3, 2022) (dismissed breach of contract, unjust enrichment, and state-specific unfair trade practices claims);

*De Leon v. New York Univ.*, 2022 WL 179812, at *10, 13-14 (S.D.N.Y Jan. 20, 2022) (dismissed tuition-based breach of contract claim; dismissed unjust enrichment claim as barred by the education malpractice doctrine);

*Moore v. Long Island Univ.*, 2022 WL 203988, at *3-5, 7 (E.D.N.Y. Jan. 24, 2022) (rejected applicability of the educational malpractice doctrine; dismissed tuition-based breach of contract and conversion claims);

*Pranger v. Oregon State Univ.*, 2022 WL 214629, at *4-6 (D. Or. Jan. 25, 2022) (rejected applicability of the educational malpractice doctrine; declined to dismiss breach of contract claim).

*substandard*, or *ineffective* constitutes a claim of educational malpractice," and "[w]here the court is asked to evaluate the *course of instruction* or the *soundness of the method* of teaching that has been adopted by an educational institution, the claim is one of educational malpractice." 926 F.3d at 1034 (emphasis added) (quoting *Dallas Airmotive*, 277 S.W.3d at 700). In the University's view, to resolve Raimo's claim—that his online experience was "something far less" than an in-person experience—would require the Court to wade into exactly the kinds of disputes involving uncertain damages that Missouri courts have routinely and purposefully avoided. Doc. 26 at 7 (quoting Doc. 23 ¶ 2); *see Soueidan*, 926 F.3d at 1036 ("If we waded into the issue of how closely SLU operated within the constructs of the aspirational Handbook and Catalog provisions cited by Soueidan"—including analysis of "whether SLU breached its contract by failing to award Soueidan a Ph.D. degree he was promised"—"we would be forced to engage—with complete disregard for Missouri law—in an educational malpractice analysis rife with practical and policy concerns.") (cleaned up) (quoting *Gillis v. Principia Corp.*, 111 F. Supp. 3d 978, 985 (E.D. Mo. 2015), *aff'd*, 832 F.3d 865 (8th Cir. 2016)).

Raimo counters that he "is not asking the Court to evaluate the quality of education at the University, but assess whether the promised in-person classes were provided at all." Doc. 29 at 3 (citing Doc. 23 ¶¶ 11-15, 32-44).

Raimo's response is unpersuasive. He cannot claim that he received no instruction or credits toward a degree *at all*. He earned the same credits, toward the same degree, as he would have in person. Raimo attempts to reframe his alleged contractual relationship with the University as an all-or-nothing deal for in-person courses in an effort to avoid the obvious conclusion that his injury, if any, is based on a perceived decrease in the value of instruction, not the lack of instruction *at all*. *See*, *e.g.*, *Gociman*, 515 F. Supp. 3d at 867 (where the plaintiffs argued that "they [were] not challenging the quality of their education, but rather alleging that defendant failed to perform the educational service 'at all,'" but the complaint "state[d] that Plaintiffs received online instruction and course credits, and repeatedly claim[ed] that the online instruction was 'worth less' than the traditional in-person instruction"). The point is made by a simple counterfactual: Had the University shut more than its physical doors and provided no classes, online or otherwise, then Raimo would be able to claim that he received

no instruction *at all*.  In fact, he received online instruction, which is manifestly not the same as no instruction at all.

Raimo further argues that the nature and causation of damages in this case are straightforward and "objectively quantifiable based on the University's own tuition differential for in-person and online education."  Doc. 29 (citing Doc. 23 ¶¶ 38, 41).  He proposes comparing the average price of tuition per credit hour at Washington University in St. Louis ($2,260 per credit) with the average price of tuition per credit hour at University College, the University's "professional and continuing education division" ($665 per credit).[4] Doc. 23 ¶¶ 38, 41.  But comparing those rates does not provide a straightforward valuation of Raimo's damages.  University College is different from the program Raimo was enrolled in.  It is the University's continuing education school.  Its courses are largely taught by adjunct professors and are open to any student who meets basic qualification criteria, including students not pursuing degrees.[5]  Moreover, "where University College offers a particular class both in person and online, tuition is *the same* regardless of the method of instruction."  Doc. 31 at 5 (emphasis in original).[6]  Raimo does not allege that University College, which requires

---

[4] In choosing the high end of Raimo's alleged price range for in-person instruction and the low end of the alleged price range for on-line instruction, the Court is construing the facts in the light most favorable to Raimo, as it is required to do on consideration of a motion to dismiss.  *Neitzke,* 490 U.S. at 326-27.

[5] *See* Registrar's Office, *Washington Univ. in St. Louis Univ. Coll., available at* https://ucollege.wustl.edu/course-registration/registrar (accessed March 14, 2022) ("University College has an open course registration policy.  Students with a high school diploma or the equivalent may register in most University College courses."); Faculty Handbook, *Washington Univ. in St. Louis Univ. Coll., available at* https://ucollege.wustl.edu/resources/faculty-staff/handbook#anchor-group-1023 (accessed March 14, 2022).  These materials are cognizable because Raimo cites University College's website and references the college's status as a "professional and continuing education division," its course offerings, and its tuition rates in his Complaint.  *See* Doc. 23 ¶ 41.  *See generally Podraza v. Whiting*, 790 F.3d 828, 833 (8th Cir. 2015) ("We also consider 'other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference[.]'") (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[6] The University cites Course Catalog, *Washington Univ. in St. Louis Univ. Coll.* (accessed September 14, 2020), *available at* https://acadinfo.wustl.edu/ucollege/?term=SP2020 (introductory course in Analytical Writing, No. U11 EComp 111, charged $1,995 in tuition for both in-person and online versions of class).  University College's course catalog is cognizable because Raimo cites to University College's website, which contains the catalog, and Raimo attached the University's course catalog to his Complaint, which specifically references University College therein.  *See* Doc. 23 ¶¶ 33, 35–36, 38, 43,

only basic qualifications to attend, offers the same courses—or courses that are equally valuable—as his program at the University, which is a highly selective, world-renowned educational institution.  Nor does he allege that courses in his program have comparable online versions, the tuition for which might have provided a relevant comparator for his in-person tuition.  Instead, Raimo would have the Court compare his program's "in-person" tuition with an entirely different program's online tuition, even though that other program charges the same amount for online and in-person instruction.  The Court is not persuaded.

In the absence of a comparable online program to whose tuition the Court could compare Raimo's tuition, Raimo's claim does ask this Court "to evaluate the course of instruction or the soundness of the method of teaching that has been adopted by an educational institution" in order to determine whether the "educational services provided were inadequate, substandard, or ineffective." *Soueidan*, 926 F.3d at 1034.  Although Raimo attempts to avoid acknowledging that his claim rests entirely on an allegation that the education he received was of diminished value relative to that he allegedly contracted for, that conclusion is unavoidable.  If he claims that the online instruction he received was not inferior to the in-person instruction he allegedly bargained for, then he has no injury of which to complain.  Raimo thus finds himself on the horns of a dilemma:  He can either predicate his claim on the breach of a promise that caused him no cognizable injury, which would result in a lack of standing; or he can claim that the education he received was of diminished value and demand that the Court quantify that difference in value—something the educational malpractice doctrine forecloses.  Either way, his claims cannot succeed and thus merit dismissal.

Notwithstanding the above, several courts have held that, "'because [the plaintiff's] allegations primarily would impact the damages element of the plaintiff's contract claim,' they do not 'form the essence of the complaint, such that the plaintiff's claims should be barred entirely at the motion to dismiss stage.'"  *Amable*, 2021 WL 3173739, at *4; *see also In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 425 (S.D.N.Y. 2021) ("The [c]ourt . . . joins the majority of district courts around the country that have declined to hold, at least on a

---

91–92, 102; Doc. 23 at 33.  *See generally Podraza*, 790 F.3d at 833 (when reviewing a motion to dismiss, courts consider documents incorporated into the complaint).

motion to dismiss (or judgment on the pleadings), that claims arising from universities' adoption of online instruction in response to the COVID-19 pandemic are barred under the educational malpractice doctrine.") (collecting cases).  The predominant theory among those courts finding that claims like Raimo's are not barred seems to be that these are breach of contract claims where the difference in value between online and in-person instruction relates only to the damages calculation and does not form the "essence" of the complaint.  *See, e.g.*, *Amable*, 2021 WL 3173739, at *3; *Warner*, 2021 WL 3276375, at *4-5.

The first court to advance that theory appears to have been *Hassan v. Fordham Univ.*, 515 F. Supp. 3d 77, 84 (S.D.N.Y. 2021).  Applying New York law, *Hassan* stated:

> New York's public policy . . . precludes lawsuits that are predicated on claims of educational malpractice, when the *essence of the complaint* is that the school breached its agreement to provide an effective education, or if a court is asked to evaluate the course of instruction or review the soundness of the method of teaching that has been adopted by an educational institution.

*Id.* (emphasis added) (cleaned up and quotation marks omitted) (quoting *Ansari v. New York Univ.*, 1997 WL 257473, at *3 (S.D.N.Y May 16, 1997)).  When faced with a question similar to that facing this Court—i.e., evaluating the quality of educational services provided by remote learning—*Hassan* concluded that that question primarily impacted the damages element of the plaintiff's contract claim, and thus did not form the essence of the plaintiff's complaint.  *Id.* at 86.  Still, even the *Hassan* Court acknowledged that such claims would be barred by New York's educational malpractice doctrine if the court were asked to "evaluate the course of instruction or review the soundness of the method of teaching" to determine whether the school provided "an effective education."  *Id.*

This Court respectfully disagrees that the damages calculation necessitated by Raimo's claim—which requires comparing two methods of instruction in an effort to determine whether, and to what extent, one was worth less than the other—is not essential to his Complaint.  That Raimo allegedly received something that was worth less than what he contracted for is the gravamen of his Complaint.  Allowing a claim requiring a damages calculation that this Court cannot perform without violating Missouri's educational malpractice doctrine to proceed beyond a motion to dismiss would subject the parties to unnecessary expense to further litigate a claim that is not viable on its face.  *See Twombly*, 550 U.S. at 556.

Raimo has not cited, and the Court has not found, any version of *Hassan*'s "essence of the complaint" exception in Missouri caselaw.  Rather, Missouri caselaw regarding the educational malpractice doctrine holds the following: (1) the doctrine applies to contract claims, *Lucero*, 400 S.W.3d at 8; (2) courts should not micromanage a university's daily operations, *Dallas Airmotive*, 277 S.W.3d at 700; (3) courts should refuse to become overseers of a university's governing policies, *id.*; (4) courts should not engage in an analysis of the quality of education received, *Soueidan*, 926 F.3d at 1034; (5) courts should not hear claims that educational services provided were inadequate, substandard, or ineffective, *id.* at 1034-35; (6) courts should not evaluate the course of instruction or the soundness of the method of teaching that has been adopted by the educational institution, *id.* at 1035; and (7) courts should not hear claims that require an inquiry into the nuances of educational processes and theories, *Blake*, 2009 WL 2567011, at *2.  One of the bases for adopting the educational malpractice doctrine in Missouri was "the inherent uncertainties about causation and the nature of damages."  *Dallas Airmotive*, 277 S.W.3d at 701.  For Raimo to ultimately prove damages, the Court would be required to compare different methods of instruction, inquire into the nuances of educational processes, and analyze the quality of education he received—precisely the kinds of analysis Missouri's educational malpractice doctrine forecloses.  Therefore, the Court finds that the Amended Complaint is barred by that doctrine.

The Court's conclusion finds support even from courts that have held otherwise.  For example, in *Lindenwood*, the court acknowledged that "Martin's damages may be intertwined with the determination of whether the remote education . . . was equivalent to the in-person instruction," however, "[a]t this early stage of litigation . . . Martin's allegations *thread the needle* and state a claim."  *Lindenwood*, 2021 WL 3077665, at *4 (emphasis added).  Another court that held similar claims were not barred by its state's educational malpractice doctrine nonetheless acknowledged the futility of claims like Raimo's:  "[I]f Plaintiffs seek to prove damages for their contract claims by assessing and comparing the educational quality of in-person and remote instruction, the educational malpractice doctrine may be implicated, and Plaintiffs' contract claims may be foreclosed."  *Barkhordar v. President & Fellows of Harvard College*, 544 F. Supp. 3d 203, 210 (D. Mass. 2021).  Unlike here, the *Barkhordar* court was satisfied that the plaintiffs' allegations had demonstrated that Harvard offered online classes at a lower cost than they charged for comparable in-person classes.  *See id.* ("[A]t this stage,

12

where Plaintiffs claim that Harvard offers online classes at a lower cost than Plaintiffs were charged, and where the court is not being asked to assess the educational quality of online versus in person education, Plaintiffs claims are not barred under the educational malpractice doctrine."). Raimo has not made such a showing here. Contrary to his assertion, as previously explained, he has not successfully alleged that the courses provided by Washington University and those offered by University College are comparable.

Moreover, this Court is not alone in holding that a COVID-19 tuition reimbursement claim is foreclosed by the educational malpractice doctrine. *See Lindner*, 2020 WL 7350212, at *6; *Gociman*, 515 F. Supp. 3d at 867; *Jones*, 2021 WL 5097769, at *4; *De Leon*, 2022 WL 179812, at *13. In *Lindner*, a student at Occidental College alleged that she entered into a contract with the college for in-person classes and that the terms of the contract were set forth in the college's publications and course catalog. 2020 WL 7350212, at *1. Similar to Raimo, she brought claims for breach of contract, breach of implied contract, unjust enrichment, and conversion. *Id.* at *3. The court concluded that underlying her claims was the theory that the online education she received was worth less than the in-person education she claims was promised, and that "the resolution of [her] claims would require the Court to make judgments about the quality and value of the education that Occidental provided in the Spring 2020 semester." *Id.* at *7. Based on that conclusion, the court dismissed all of her claims, explaining that they were "the type of educational malpractice claims that California courts, and courts throughout the country, have rejected." *Id.*

In *Gociman*, students at Loyola University in Chicago alleged that Loyola's "website, brochures, course catalogs, and online registration portal established a contractual promise to provide in-person instruction and access to facilities and resources," and sought damages "representing the difference in value between in-person classes and access to facilities, and the online education they received." 515 F. Supp. at 865. The *Gociman* court found that:

> [T]he theory underlying all of plaintiffs' claims is that the education plaintiffs received once defendant transitioned to remote instruction in response to the COVID-19 pandemic was worth significantly less than the value of live classes. Thus, resolution of Plaintiffs' claims would require the Court to make judgments about the quality and value of the education [the university] provided in the Spring 2020 semester . . . Plaintiffs attempt to avoid this flaw by arguing that they are not challenging the quality of their education, but rather alleging that defendant failed to perform the educational service "at all."

13

> Plaintiffs' argument is contradicted by [the complaint], which states that plaintiffs received online instruction and course credits, and repeatedly claims that the online instruction was "worth less" than the traditional in-person instruction. . . . Consequently, the court concludes that plaintiffs' claims are the type of educational malpractice claims that Illinois courts, and courts throughout the country, have rejected.

*Id.* (internal quotation marks omitted) (quoting *Lindner*, 2020 WL 7350212, at *7).

Similar to *Lindner* and *Gociman*, Raimo alleges that the University was contractually obligated to provide in-person classes based on an array of promotional language taken from the University's website, Doc. 23 ¶¶ 24, 25, 27, 29, 30; the University's Spring 2020 course listings showing classes with associated building numbers, *id.* ¶ 33, Ex. A; and the University's usual and customary practice of providing on-campus instruction, *id.* ¶ 34.  As previously discussed, however, the theory underlying each of Raimo's claims is that he was promised in-person classes and received something less valuable.[7]  That is made plain by his claim to have suffered damages in the amount of the difference in value between online and in-person courses.  *See* Doc. 29 at 4.  Resolving his claims would require the Court to make judgments about the quality and value of the education that the University provided during the Spring 2020 semester, a task foreclosed by Missouri law.  *See Lucero*, 400 S.W.3d at 8; *Dallas Airmotive*, 277 S.W.3d at 700; *Soueidan*, 926 F.3d at 1034-35; *Blake*, 2009 WL 2567011, at *2.

Thus, Raimo's claims are barred by Missouri's educational malpractice doctrine and must be dismissed on that basis.  Given the lack of unanimity among district courts on that issue, however, the Court will also address the University's other arguments for dismissal of each claim.

---

[7] *See* Doc. 23 ¶ 2 ("while students enrolled and paid Defendant for a comprehensive in-person academic experience, Defendant instead offers Plaintiff and Class Members something far less: a limited online experience"); *id.* ¶ 6 ("students have paid WUSTL for in-person instruction that is no longer available to them . . The result is an enormous windfall to WUSTL"); *id.* ¶ 7 ("Defendant's actions have financially damaged Plaintiff and Class Members . . . because [they] did not receive the full value of the services paid"); *id.* ¶ 39, 41 (claiming that online classes are less valuable than in-person classes); *id.* ¶¶ 60-61 ("Plaintiff and Class Members have been provided with an online substitute" that is "vastly different" and should entitled Plaintiff and Class Members to "prorated reimbursements of tuition and fees"); *id.* ¶ 66 (citing an article quoting that universities' "tuition and fees do not accurately reflect the value lost by switching to online education"); *id.* ¶ 96 ("The online classes provided by Defendant are objectively different from—and less valuable than—the on-campus classes for which the parties contracted.").

## II.   Counts I & II: Breach of Contract

### A.  Breach of Contract

To plead a claim for breach of contract under Missouri law, a plaintiff must allege sufficient facts to establish: "(1) the existence and terms of a contract; (2) that the plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney*, 304 S.W.3d at 104.  The plaintiff must also establish "the rights of plaintiff and obligations of defendant under the contract." *C. Am. Health Sciences Univ., Belize Med. College v. Norouzian*, 236 S.W.3d 69, 84 (Mo. App. 2007).   Missouri law thus requires Raimo to identify which rights or obligations the University breached under the contract in order to establish his claim.  *Lucero*, 400 S.W.3d at 5.

"[I]n order to assert a breach of contract claim against a university, a student plaintiff must 'point to an identifiable contractual promise that the university failed to honor.'"  *Nickel v. Stephens College*, 480 S.W.3d 390, 397 (Mo. App. 2015) (quoting *Lucero*, 400 S.W.3d at 5). Although other jurisdictions have determined otherwise, there is no "case law in Missouri that expressly finds the existence of a contractual relationship between a student and a university." *Lucero*, 400 S.W.3d at 4-5.   A contractual relationship may be found, however, if the student establishes a "specific promise or obligation" that the university has failed to uphold.  *Id*. at 5. Therefore, a student alleging breach of contract against a university must establish that the university "failed to provide *specifically promised* educational services."  *Blake*, 2009 WL 2567001 at *2 (emphasis in original); *see also Lucero*, 400 S.W.3d at 9 ("[T]he provisions of the Collected Rules and Regulations, Faculty Bylaws, and the class schedule upon which Appellant relies do not constitute *specific, discrete promises* sufficient to form the basis for a breach of contract claim[.]") (emphasis added).

Several courts have recently dismissed breach of contract claims similar to Raimo's because the students failed to allege the existence of a specific promise to provide in-person instruction.  *See, e.g.*, *Gociman*, 515 F. Supp. 3d at 867 (holding that the plaintiff's claim, based on the course catalog, which contained "parenthetical notations following course descriptions, stating, 'lecture (in-person),'" "failed to allege a specific promise for in-person instruction"); *Shak*, 549 F. Supp. 3d at 272 (course catalog, which "identified courses offered, instructors, and the times and locations of classes" did not "constitute a specific promise . . . to provide 'certain

specified services' . . . [as] there are no express statements promising that these aspects of a course were not subject to change"); *Fedele*, 2021 WL 3540432 at *4 ("allegations that universities provided students with the ability to search for courses based on whether they were taught in person or online are insufficient to demonstrate a specific promise to provide an in-person educational experience") (citing *Amable*, 2021 WL 3173739, at *6); *Morales v. New York Univ.*, 2021 WL 1026165, at *2 (S.D.N.Y. Mar. 17, 2021).[8]

The University argues that Raimo's claim likewise fails to allege a specific, discrete promise for in-person instruction. Doc. 26 at 9. Raimo counters that he contracted with the University specifically for "in-person" classes. Doc. 23 ¶ 33. In support, Raimo points to an array of promotional language taken from the University's website, *id.* ¶¶ 24, 25, 27, 29, 30; the course catalog, which showed that classes were assigned building numbers, *id.* ¶ 33, Ex. A; and the University's usual and customary practice of providing on-campus instruction, *id.* ¶ 34. Raimo claims that the "combination of the express terms of the course catalog, Defendant's publications and Defendant's usual and customary practice constituted an offer . . . for in-person classes." Doc. 23 ¶ 36. The University replies that Raimo cannot "piece together some unspoken, unwritten promise to provide in-person learning" as a basis for an express contract; rather, he must identify "objective or quantifiable promises." Doc. 26 at 11 (quoting *Lucero*, 400 S.W.3d at 7).

### 1. *University Website Promotional Language*

The promotional language Raimo cites is merely "aspirational in nature," and "cannot constitute the basis for a breach of contract claim." *Lucero*, 400 S.W.3d at 6. Specifically, Raimo cites the following:

- WUSTL's campuses are located near the cultural center of St. Louis, surrounded by and adjacent to museums, performance venues, vibrant entertainment and dining districts, one of the nation's largest civic parks, and beautiful, tree-lined neighborhoods rich in history and diversity. . . . [T]he best things in St. Louis are just steps from campus

---

[8] *But see Lindenwood*, 2021 WL 3077665, at *6 (finding, where an admissions publication stated "you will enjoy a beautiful and expansive campus," that the University's "publications, 'marketing, pricing, agreements, policies, and established course of conduct' created an expectation that [plaintiff] was paying for an in-person college experience").

where the knowledge and resources of this city are yours for the taking. Doc. 23 ¶ 24.

- WUSTL boasts an impressive faculty deeply involved on campus and in the larger community.  The 7:1 student to faculty ratio and the small, personalized nature allows for more hands-on opportunities to develop real-world skills including experiential learning and analytical rigor for Olin Business School students.  *Id.* ¶ 25.

- All first-year students are required to live on campus in one of the 10 residential colleges in a part of campus called the "South 40." Defendant describes the South 40 as its own small town, complete with a student government, dining facilities, a fitness center, a technology center, meeting rooms, intramural fields, basketball and sand volleyball courts, and more.  A gift shop, a convenience store, a mailroom, and several student-run businesses are located there too. *Id.* ¶ 27.

- Students living in the residential college community will get to know others and become involved in numerous activities and organizations. You'll be encouraged and supported in your intellectual development and your relationships with others, including students, faculty, and staff.  Moreover, students have the opportunity to participate and lead community programing within their residential college including large sporting events, outdoor music festivals, a formal dance, outings to St. Louis attractions, community service activities, and more.  *Id.* ¶ 27.

- Many upperclass students live in residential colleges each with its own unique resources, activities, and traditions, including open mic nights, resume advice over donuts, and a toast to graduating seniors on the terrace.  Further, Defendant notes that each residential college also has faculty, student, and staff members dedicated to helping you pursue your personal and educational goals.  *Id.* ¶ 28.

- As libraries and books are essential to your undergraduate education, WUSTL has 12 libraries that put comfortable study and collaborative spaces within easy reach.  *Id.* ¶ 29.

- Additionally, WUSTL offers hundreds of opportunities to try new things and enrich your college experience including more than 480 student organizations where students can connect with people who have similar interests or explore a new path.  *Id.* ¶ 30.

Doc. 29 at 6-7.

None of those allegations amounts to a specific, discrete promise for in-person instruction.  The claim that comes the closest—that all first-year students were required to

live on campus—concerns on-campus *living,* not learning.   As Raimo acknowledges, the University issued refunds related to the closure of university housing.  *See* Doc. 23 ¶ 74 ("[The University] has agreed to refund student accounts with a calculated amount of unused housing and other fees[.]").  The remaining claims are either facts that remain true[9] or are aspirational claims of the type *Lucero* rejected.  *See* 400 S.W.3d at 5-6 (rejecting breach of contract claim based on the university's regulations and faculty bylaws that amounted to "general statements that . . . a university seeks to achieve in maintaining a positive work and learning environment").

### 2.   *University Course Catalog*

Raimo also relies on the University's course catalog, which shows that certain courses were assigned building and room numbers.  Doc. 23 ¶ 33, Ex. A.  The University argues that classroom assignments are also aspirational in nature, and do not create a specific promise to hold those classes in those rooms under any and all circumstances.  Doc. 26 at 10.  *See Lucero*, 400 S.W.3d at 9 (noting that courts have found that "the rescheduling of a course time was not an instance in which the university has failed to provide a guaranteed service, and thus, failed to constitute a situation in which contractual liability existed").

The course catalog could not have formed the necessary mutual agreement between the University and its students sufficient to create a contractual obligation.  "In Missouri, one of the essential elements of contract formation is a 'mutuality of agreement.'"  *See Katz v. Anheuser-Busch, Inc.*, 347 S.W.3d 533, 544-45 (Mo. App. 2011) (quoting *Kunzie v. Jack-in-the-Box, Inc.*, 330 S.W.3d 476, 483 (Mo. App. 2010).  "A 'mutual agreement' is reached when 'the minds of the contracting parties meet upon and assent to the same thing in the same sense at the same time."  *Id.* (quoting *Kunzie*, 330 S.W.3d at 483-84).  No university could reasonably intend, and no student could reasonably expect, that a university's course catalog would create a binding obligation to hold each and every course in the specifically listed classroom under any and all circumstances.  That theory would expose universities to litigation any time a professor fell ill and canceled a class, an administration moved a class to a larger or smaller

---

[9] The University's campus is still "located near the cultural center of St. Louis"; "the 7:1 student to faculty ratio" is not alleged to have changed; and the "more than 480 student organizations" are not alleged to have been dissolved.

room to accommodate enrollment, or a room was changed due to a scheduling conflict.  The University's course catalog reflected its intent to hold the listed courses in certain buildings and rooms.  It did not create a binding obligation to do so.

### 3. The University's Customary Practice

Raimo claims that the University's usual and customary practice of providing on-campus instruction constituted a specific promise for in-person education.  Doc. 23 ¶ 34.  He alleges that that custom gave rise to a reasonable expectation that Spring 2020 classes would be provided on-campus.  *Id.* ¶ 35.  The University responds that customs do not ordinarily give rise to contractual obligations, and that holding otherwise would be even less justified under the unusual circumstances of a global pandemic.  Doc. 26 at 11.  The Court agrees.

Under longstanding Missouri law, "the concept of custom and usage requires that the parties have entered into a contract which either has omitted a provision or has expressed the agreement uncertainly."  *Buxton v. Harsh*, 631 S.W.2d 95, 97-98 (Mo. App. 1982).  "Usages and customs are useful in the interpretation of a contract made with respect thereto, but they cannot make a contract where there is none."  *Id.* at 97 (citing *State ex inf. Crow v. Atchison, T. & S.F. Ry. Co.*, 75 S.W. 776, 780 (Mo. banc 1903)).  Because Raimo has not otherwise sufficiently alleged a specific promise establishing that a mutual agreement to provide in-person instruction existed, he cannot use the concept of custom and usage to create a contract where there otherwise is none.

Because Raimo fails to establish the existence of a specific, discrete promise to provide in-person instruction, his Count I fails to state a claim for breach of contract under Missouri law.

### B. Breach of Implied Contract

Added to the Amended Complaint as an alternative to Count I, Count II alleges that Raimo entered into an implied contract by "accepting Defendant's offer to register for on-campus classes and use Defendant's facilities."  Doc. 23 ¶ 100.  In support, Raimo pleads the same facts as in his breach of contract claim.  Specifically, he alleges that the University's "course catalog, brochures, advertisements, and other promotional materials," as well as the University's "usual and customary practice of providing on-campus courses," gave rise to a reasonable expectation that he and the class members were mutually agreeing to on-campus instruction.  Doc. 23 ¶¶ 100, 102.

As previously described, "in order to assert a breach of contract claim against a university, a student plaintiff must 'point to an identifiable contractual promise that the university failed to honor," *Nickel*, 480 S.W.3d at 397, and must allege that the university "failed to provide *specifically promised* educational services." *Blake*, 2009 WL 2567011 at *2 (emphasis in original); *see also Lucero*, 400 S.W.3d at 9 ("the provisions of the Collected Rules and Regulations, Faculty Bylaws, and the class schedule upon which Appellant relies do not constitute specific, discrete promises sufficient to form the basis for a breach of contract claim"). "While other jurisdictions have found a contractual relationship exists between a student and a university," *Lucero*, 400 S.W.3d at 4 (citing *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998) (explaining that New York courts have suggested that when "a student enrolls at a university, an implied contract arises")), there is no "case law in Missouri that expressly finds the existence of a contractual relationship between a student and a university." *Lucero*, 400 S.W.3d at 4-5. Raimo does not cite, and the Court has not found, any Missouri case "that has held that an implied contract for educational services arises between a student and a University." *Nickel*, 480 S.W.3d at 397. Therefore, Raimo's Count II fails to state a claim for breach of implied contract under Missouri law.

### III.   Count III:  Unjust Enrichment

To state a claim for unjust enrichment under Missouri law, a plaintiff must allege sufficient facts to establish that (1) they conferred a benefit on the defendant, (2) the defendant appreciated the benefit, and (3) the defendant accepted and retained the benefit under inequitable or unjust circumstances. *Almat Builders & Remodeling, Inc. v. Midwest Lodging, LLC*, 615 S.W.3d 70, 80 (Mo. App. 2020). "The most significant requirement is that the enrichment to the defendant be unjust." *Id.* (citing *Green Quarries, Inc. v. Raasch*, 676 S.W.2d 261, 264 (Mo. App. 1984)). The University does not contest the first two elements. Doc. 26 at 12-13. The only question is whether Raimo adequately pleads that the University "retained the benefit under inequitable or unjust circumstances." *Id.* The Court finds that he does.

Count III alleges that Raimo and the class members "directly conferred non-gratuitous benefits upon Defendant" in the form of tuition so that they "could avail themselves of in-person educational opportunities and utilize campus facilities," Doc. 23 ¶ 111, and that Defendant "knowingly, inequitably, and unjustly chose to retain and profit from" those

20

benefits, *id.* ¶ 117.  Raimo also alleges that, by keeping what students have paid for "in-person instruction that is no longer available to them, access to buildings they can no longer enter, technology, programs and services that [it] is no longer providing, and activities that are no longer available," the University is "profiting from COVID-19 while further burdening students and their families," and the "result is an enormous windfall" to the University.  *Id.* ¶ 6.  At the motion to dismiss stage, such allegations are sufficient to assert a claim that the University "accepted and retained the benefit under inequitable or unjust circumstances." *Almat Builders*, 615 S.W.3d at 80; *see Hawkins v. Nestle U.S.A. Inc.*, 309 F. Supp. 3d 696, 708 (E.D. Mo. 2018) (finding unjust enrichment claim sufficiently pled under Missouri law); *Fiore*, 2021 WL 4925562, at *18-19 (finding tuition-related unjust enrichment claim sufficiently pled where student alleged that they could not access campus facilities during COVID-19).

## IV.    Count IV:  Conversion

"Conversion is the unauthorized assumption of the right of ownership over personal property of another to the exclusion of the owner's right."  *Emerick v. Mut. Benefit Life Ins. Co.*, 756 S.W.2d 513, 523 (Mo. banc 1988); *see also Missouri Ozarks Radio, Network, Inc. v. Baugh*, 598 S.W.3d 154, 160 (Mo. App. 2020).  To plead a claim for conversion, a plaintiff must allege that the:    "(1) plaintiff was the owner of the property or entitled to its possession; (2) defendant took possession of the property with the intent to exercise some control over it; and (3) defendant thereby deprived the plaintiff of the right to possession."  *JEP Enters., Inc. v. Wehrenberg, Inc.*, 42 S.W.3d 773, 776 (Mo. App. 2001).

Ordinarily, "[c]onversion is not the appropriate action when the claim is solely for the recovery of money."  *Boswell v. Panera Bread Co.*, 91 F. Supp. 3d 1141, 1145 (E.D. Mo. 2015) (citing *Capitol Indem. Corp. v. Citizens Nat'l Bank of Ft. Scott, N.A.*, 8 S.W.3d 893, 900 (Mo. App. 2000)).  Thus, had Raimo's claim been to recover his tuition payments, it would be readily dismissed.  Raimo clarifies, however, that his conversion claim is not about the tuition; rather, it is based on the University's deprivation of his "intangible right to an on-campus and in-person educational experience."  Doc. 23 ¶¶ 121-25; Doc. 29 at 13.

Missouri law recognizes conversion for "intangible rights merged with a document, including negotiable instruments and engineering plans."  *J&J Sports Prods., Inc. v. Garcia*, 2014 WL 2644194, *4 (E.D. Mo. June 13, 2014).  Raimo claims that he and the class "have an ownership interest in their right to be educated at a certain location," and that the University's

"matriculation documents" serve as the required incorporating document because they "identify Plaintiff and class members as students paying in-person tuition rates."  Doc. 29 at 13.

The alleged matriculation documents, which Raimo neither provides nor describes in his Complaint, are not the type of document with which intangible rights may be merged for purposes of a conversion claim.  "Although the tort of conversion generally may extend to the type of intangible property rights that are merged or incorporated into a *transferable* document, it does not extend to completely intangible rights or to situations in which the relevant document itself has not been *transferred*."  90 C.J.S. Trover & Conversion § 14 (2020) (emphasis added) (citing *Arcadia Biosciences, Inc. v. Vilmorin & Cie,* 356 F. Supp. 3d 379 (S.D.N.Y. 2019); *Allied Inv. Corp. v. Jasen*, 731 A.2d 957, 731 A.2d 957 (Md. 1999)).  Here, Raimo has not established that the matriculation documents were transferable or transferred to him.

The requirement that the incorporating document be transferable is demonstrated by *Weicht v. Suburban Newspapers of Greater St. Louis, Inc.*, 32 S.W.3d 592, 596 (Mo. App. 2000), on which Raimo unsuccessfully relies.  Doc. 29 at 13.  In *Weicht*, the plaintiffs were independently contracted newspaper carriers for Suburban Newspapers. 32 S.W.3d at 595. Their contracts with Suburban provided them with the exclusive right to distribute newspapers on certain routes and to sell their right to that route.  *Id.*  The plaintiffs claimed that Suburban Newspapers had converted their rights in the newspaper routes by destroying the routes' value.  *Id.* at 596.  Unlike Raimo's alleged intangible right here, however, the newspaper routes were incorporated in an express contract.  *Id.* at 592.  More importantly, they were transferrable.  *Id.*  Raimo does not allege, nor could he, that he was entitled to sell his purported right to an in-person education at the University.  The University's strict admission requirements are but one barrier to such an argument.  If a university education were transferable, thousands of bright students would make money by selling their rights to attend prestigious institutions to students who were unable to satisfy admission requirements.

Because Count IV identifies no transferable document incorporating Raimo's alleged intangible right, it fails to state a claim for conversion and must be dismissed.

CONCLUSION

Raimo's claims are all barred by Missouri's educational malpractice doctrine.  Counts I, II, and IV (breach of contract, breach of implied contract, and conversion) also fail to state a claim upon which relief could be granted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss, Doc. 25, is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Amended Complaint is **DISMISSED with prejudice.**

A separate Order of Dismissal will accompany this Memorandum and Order.

Dated this 16th day of March, 2022.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE